FIREBAUGH CANAL CO.; Central California Irrigation District; Sumner Peck Ranch Inc., Plaintiffs–Appellees,

v.

UNITED STATES of America; United States Department of the Interior; Bureau of Reclamation, Defendants–Appellants.

Firebaugh Canal Co.; Central California Irrigation District; Sumner Peck Ranch Inc., Plaintiffs–Appellees,

* v.

United States of America; United States Department of the Interior; Bureau of Reclamation, Defendants,

and

County of Contra Costa; Contra Costa Water District; Contra Costa County Water Agency; Natural Resources Defense Council; The Bay Institute, Defendants–Intervenors–Appellants.

Nos. 95–15300, 95–16641.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1998

Decided Feb. 4, 2000

**570**

Jeffrey C. Dobbins, United States Department of Justice, Washington, D.C., for the defendants-appellants.

William M. Smiland, Smiland & Khachigian, Los Angeles, California, Michael V. Sexton, Minasian, Spruance, Baber, Meith, Soares & Sexton, LLP, Oroville, California, for the plaintiffs-appellees.

Laurens H. Silver, California Environmental Law Project, Mill Valley, California, for the defendants-intervenors-appellants.

Thomas W. Birmingham, Kornick, Moskovitz, Tiedemann & Girard, Sacramento, California, for the defendant-intervenor-appellee.

Before: HUG, Chief Judge, FLETCHER and TROTT, Circuit Judges.

HUG, Chief Judge:

The United States Government appeals a judgment entered against the Department of Interior and the Bureau of Reclamation that requires the Department to "take such reasonable and necessary actions to promptly prepare, file and pursue an application for a discharge permit" with the California Water Resources Control Board, pursuant to the Government's duty to provide drainage under the San Luis Act. This court has jurisdiction over final judgments entered by the district court pursuant to 28 U.S.C. § 1291. We agree with the district court that the Government's duty to provide drainage service under the San Luis Act has not been excused by subsequent Congressional action, and that the Government has failed to provide the required drainage service for many years. However, the remedial order entered by the district court limits the Government's discretion to satisfy its drainage duty in alternate ways without construction of the interceptor drain. Consequently, we affirm in part, reverse in part, and remand to the district court for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

The Central Valley Project is the nation's largest federal reclamation project. The project's dams and water conveyance facilities span the length of California's Central Valley, from Shasta Dam, in the north, to the Friant–Kern Canal, in the south. On June 3, 1960, Congress authorized the construction of the San Luis Unit "as an integral part of the Central Valley project," with the principal purpose of furnishing water for irrigation of land in Merced, Fresno and Kings Counties, California. *See* Pub.L. No. 86–488, 74 Stat. 156 (1960) (the "San Luis Act").

Irrigation and drainage are inherently linked. Any water project that brings fresh water to an agricultural area must take the salty water remaining after the crops have been irrigated away from the service area. For this reason, the San Luis Act expressly conditioned the construction of the San Luis Unit on the provision for drainage facilities, which could be provided either by the State of California or the Department of the Interior. The Feasibility Report for this project, prepared by the Secretary of the Interior in 1956, contemplated a system of tile drains that would empty into an interceptor drain that would convey the water 197 miles to the Contra Costa Delta for disposal. The Feasibility Report is expressly referenced in section 1(a)(2) of the San Luis Act.

On June 21, 1961, the State of California notified the Secretary of the Interior that California would not provide a master drain. In response, on January 9, 1962, the Secretary of the Interior informed Congress that the Secretary would make provision for constructing the San Luis interceptor drain to the Contra Costa Delta. Thereafter, construction of the San Luis Unit began, and in 1967, the Project started water deliveries to Westlands Water District ("Westlands"). In March, 1968, construction of the interceptor drain was initiated, and by 1975, the middle 40% of the drain (about 82 miles) was built. The Secretary of the Interior also built Kesterson Regulating Reservoir (the "Reservoir") located at the north end of the middle portion of the drain, which was designed as a regulating reservoir for the drain en route to its planned terminus at the Contra Costa Delta.

The 1965 Public Works Appropriation Act, Pub.L. No. 88–511, 78 Stat. 778, 782 (1964), contained a provision prohibiting selection of a final point of discharge for the drain until certain conditions were met. An appropriations rider with similar, but not identical language, has been included in nearly every annual appropriations act since 1965.[1] These appropriation riders prohibited the Secretary of the Interior from establishing the terminus of the drain until environmental concerns regarding the effect of the agricultural effluent on the San Francisco Bay could be addressed jointly by the Bureau of Reclamation and the State of California. No environmental standard has been established in the past thirty-four years since the first appropriation rider. The drain was built with funds from lump-sum congressional appropriations for reclamation projects, notwithstanding the existence of the above appropriation riders.

In 1975, the Secretary suspended construction of the interceptor drain, citing "questions" and "concerns" raised in the public arena. Nonetheless, a subsurface drainage collector system was constructed for Westlands Water District and drainage service began in 1978. The subsurface collector drainage system discharged approximately 7,300 acre-feet annually of collected subsurface agricultural drainage into the portion of the drain constructed prior to 1975. The drain carried the drainage water to Kesterson Reservoir, which had become the temporary terminus of the drain.

In mid–1983, waterfowl nesting studies at Kesterson Reservoir revealed instances of embryo deformity and mortality. It was suspected that selenium in some of the soils in Westlands was being carried with

1. With the exception of FY 94, FY 95, FY 96, and the continuing resolution years of FY 83 and FY 79, Congress has placed nearly identical limits on funds provided to the Bureau of Reclamation. The most recent rider states, "None of the funds appropriated or otherwise made available by this Act may be used to determine the final point of discharge for the interceptor drain for the San Luis Unit until

development by the Secretary of the Interior and the State of California of a plan, which shall conform with the water quality standards of the State of California as approved by the Administrator of the Environmental Protection Agency, to minimize any detrimental effect of the San Luis drainage waters." Pub.L. No. 105–62, § 510(a), 111 Stat. 1320, 1340 (1997).

drainage water into Kesterson Reservoir and was concentrating in biota. Like other metals, selenium can impair the growth of crops and is hazardous to human and animal life when present in high concentrations. On March 15, 1985, the Secretary of the Interior announced that it would close the Reservoir. Pursuant to that end, the drains at Westlands were plugged and the middle portion of the interceptor drain was closed as of June 1986. However, the United States continued to deliver water, without drainage service, to Westlands.

Affected landowners, both inside and outside the San Luis Unit service area, sued the Department of the Interior, seeking completion of the master drain to the Contra Costa Delta. *See Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, No. CV–F–91–048, 823 F.Supp. 715; *Firebaugh Canal Co. v. USA*, No. CV–F–88–634. The plaintiffs include the largest contractor for water from the San Luis Unit, Westlands Water District, some of the individual water users within Westlands, specifically Sumner Peck Ranch, Inc., et al. ("Sumner Peck Plaintiffs"), and two water districts downslope of the San Luis Unit (the "Firebaugh Canal Plaintiffs"). In May of 1992, these lawsuits were partially consolidated to resolve the plaintiffs' mutual allegation that the Secretary of Interior is required by law to construct facilities to drain agricultural drainage water from certain lands in Westlands Water District. The plaintiffs filed a motion for partial summary judgment, which was granted by the district court. The district court's unpublished opinion held that the San Luis Act required the Government to provide drainage service to lands receiving water through the San Luis Unit.

Following the partial summary judgment, the Government argued that subsequent changes in the law and environmental knowledge made compliance with the San Luis Act impossible, and thereby excused the United States from performing that duty. A three week bench trial was held to assess this claim—to determine whether the Secretary's drainage obligation "had been excused by factual or legal impossibility," and if not, "the extent of the court's authority to order compliance with that obligation," as well as "what non-monetary relief, if any, should be ordered." *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, No. CV–F–91–048; *Firebaugh Canal Co. v. USA*, No. CV–F–88–634 (E.D.C.A. Dec. 2, 1994). The Government presented substantial expert testimony that argued that the Government's duty to build the interceptor drain had been excused by reason of impossibility, supervening illegality, or implicit repeal. Both oral and documentary evidence was introduced on the effect of California water quality laws, the Endangered Species Act, the Migratory Bird Treaty Act, the Clean Water Act, the Central Valley Project Improvement Act, and past appropriation riders. In addition, the district court viewed affected lands within the San Luis Unit service area.

The district court concluded that the Secretary's responsibility to construct a drain had not been excused. In most instances, the district court found, concerns about the concentration of pollutants in the drainage water could be resolved in proceedings for a discharge permit that would have to occur before the California Water Resources Control Board. The district court also rejected the Government's contentions that subsequent action by Congress had implicitly or explicitly repealed the mandatory requirement to construct a drain.

On March 13, 1995, the district court issued a Partial Judgment based on its conclusions that the San Luis Act established a mandatory duty to provide drainage that had not been excused. In the judgment, the district court ordered the Secretary of the Interior and the Bureau of Reclamation to "take such reasonable and necessary actions to promptly prepare, file and pursue an application for a discharge permit" with the California Wa-

ter Resources Control Board. *Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* No. CV–F–91–048; *Firebaugh Canal Co. v. USA,* No. CV–F–88–634 (E.D.C.A. Mar. 10, 1995). The Government appeals this judgment.

Contra Costa County, the Contra Costa Water Agency, the Contra Costa Water District, the National Resources Defense Council, and The Bay Institute have intervened in this appeal, in support of the United States, as these entities have an interest in the water quality of the Contra Costa Delta, the potential terminus of the San Luis interceptor drain (the "Intervenors").

## DISCUSSION

### I Standard of Review

■ We review the district court's interpretation of the San Luis Act, a federal statute, *de novo. Tierney v. Kupers,* 128 F.3d 1310, 1311 (9th Cir.1997).

### II The Government's Duty under the San Luis Act

The Government contends that the plain language of the San Luis Act does not require the Bureau of Reclamation to build the interceptor drain to the Contra Costa Delta. Further, the Government asserts that the district court erred by failing to defer to the Agency's reasonable interpretation of the San Luis Act. We reject these arguments.

■ We are confronted with two questions when reviewing an agency's construction of a statute it administers. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, always, is the question of whether Congress has directly spoken to the precise question at issue." *Id.* "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. 2778 (citations omitted).

■ If, however, the court determines Congress has not directly addressed the precise question at issue, we do not simply impose the agency's construction of the statute-rather the question is whether the agency's answer is based on a permissible construction of the statute. *See id.* Under these conditions, an executive agency interpretation is afforded considerable deference, unless it is arbitrary, capricious, or manifestly contrary to the statute. *See id.* at 844, 104 S.Ct. 2778.

■ First, the Government contends that the San Luis Act is an authorizing statute, and does not require the construction of the interceptor drain to the Contra Costa Delta.[2] We find the plain language of the San Luis Act in direct conflict with the Government's argument.

It is true that the San Luis Act "authorized," but did not require, the Secretary to "construct, operate, and maintain the San Luis *unit.*" Pub.L. No. 86–488, 74 Stat. 156 (emphasis added). However, the discretion contained in this authorization is limited to the decision whether to construct the *unit.* The very next sentence of the statute specifically defines which "principal engineering features" are to be included in the "unit" (if the unit is constructed), and it thus denies the Secretary discretion as to what constitutes the San Luis "unit."

■ The statute directs that the "principal engineering features of said *unit shall be* [a dam, reservoir, etc.] *and necessary ... drains.*" *Id.* (emphasis added). The term "shall" is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the

---

**2.** The dissent also seizes briefly upon this argument. *See* dissent at 578–79.

term is used in its ordinary sense unless there is clear evidence to the contrary. *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1166, 137 L.Ed.2d 281 (1997). Here, there is no evidence that Congress misused the term "shall" or intended that the word is precatory, as asserted by the Government. Thus, although the Department of the Interior was only authorized (and not required) *to construct the unit,* once it decided to construct the unit, it was *required* to construct "necessary . . . drains" as part of the unit. In other words, the Department's discretion was limited to the decision whether to build the unit, not to pick and choose which "principal engineering features" to include in the unit—Congress made that decision.

■ The Government further contends that the San Luis Act reference to "necessary . . . drains" does not include the interceptor drain. This interpretation conflicts with section (1)(a)(2) of the San Luis Act. The 1956 Feasibility report expressly contemplated providing drainage in conjunction with irrigation water. Within this context, section (1)(a)(2) expresses a clear indication that either the State of California or the Department of the Interior shall provide a drainage plan prior to construction of the San Luis Unit. After the State of California indicated that it would not provide a master drain, the Secretary of Interior had a choice: provide for the interceptor drain or forego construction of the San Luis Unit.

The statutory language makes clear that if construction of the San Luis Unit commenced, the Secretary's discretion was limited to a determination of which lands within the unit need drainage service to protect their arability and how big the interceptor drain must be to meet the drainage requirements of the San Luis Unit. After assuring Congress that the Department of the Interior had made provision to construct an interceptor drain of sufficient capacity to serve the drainage requirements of the San Luis Unit, the Secretary did not have unlimited discretion

to determine whether the construction of a drain was necessary at all.

The Government also contends that the Secretary's mandate was limited to "providing for" the interceptor drain and does not necessitate construction or completion. This analysis leaves section (1)(a)(2) without meaning, by allowing the San Luis Unit to be constructed without a means of comprehensive drainage. Consequently, we must also reject this argument.

We conclude that the San Luis Act clearly expresses the intent of Congress to provide for the interceptor drain prior to the construction of the San Luis Unit. Since Congressional intent is clear from the statutory language, we find no need to consider the Agency's interpretation of the statute. Agency deference is limited to circumstances where Congress has not directly spoken to the precise question at issue. When the intent of Congress is clear, as here, the court must give effect to the unambiguously expressed intent of Congress. We reject the Government's invitation to create ambiguity from the statute's plain language. For these reasons, the district court's finding that the San Luis Act mandated the Secretary to provide the interceptor drain is proper.

### III Effect of Subsequent Congressional Action on the Government's Duty under the San Luis Act

■ Beginning in 1965, and continuing for almost every year up through the present time, Congress has approved language in the appropriations acts for the Department of the Interior, which provides:

> None of the funds appropriated or otherwise made available by this Act may be used to determine the final point of discharge for the interceptor drain for the San Luis Unit until development by the Secretary of the Interior and the State of California of a plan, which shall conform with the water quality standards of the State of California as approved by the Administrator of the

Environmental Protection Agency, to minimize any detrimental effect of the San Luis drainage waters.

Pub.L. No. 105–62, § 510(a), 111 Stat. 1320, 1340 (1997).

The Government, Intervenors, and the dissent contend that these appropriation riders cumulatively lead to an implicit repeal of the Secretary's duty to provide drainage under the San Luis Act. We disagree.

 In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court held that without express action of Congress appropriations for a multi-million dollar dam did not repeal the protection of an animal's "critical habitat" under the Endangered Species Act. In reaching this decision, the Court reiterated the " 'cardinal rule ... that repeals by implication are not favored.' " *Id.* (quoting *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). Rather, " '[t]he intention of the legislature to repeal must be clear and manifest,' " *id.* (quoting *Posadas v. National City Bank of N.Y.,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936)), and "[i]n the absence of some affirmative showing of an intention to repeal, the *only* permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable," *id.* at 190, 98 S.Ct. 2279 (quoting *Morton,* 417 U.S. at 550, 94 S.Ct. 2474) (emphasis added). This doctrine of disfavoring repeals by implication "applies with full vigor when ... the subsequent legislation is an appropriations measure." *Id.* (internal quotation omitted).[3]

We find *TVA* directly applicable to this case. First, the appropriations acts do not provide an "affirmative showing of an intention to repeal" the drainage require-

ments of the San Luis Act. The acts state that the Department of the Interior is not to use any of the funds appropriated "to determine the final point of discharge for the interceptor drain for the San Luis Unit *until* development by the Secretary of the Interior and the State of California of a plan ... to minimize any detrimental effect of the San Luis drainage waters." Pub.L. No. 105–62, § 510(a), 111 Stat. 1320, 1340 (1997) (emphasis added). As can be garnered from the plain meaning of these acts, Congress merely placed a condition on the determination of the final point of discharge; by no means did it excuse or repeal the Secretary's obligation to provide drainage. Indeed, the appropriations acts themselves contemplate the existence of an "interceptor drain for the San Luis Unit" (albeit with a yet-to-be-determined point of discharge), as well as "San Luis drainage waters." It is thus apparent from the language of the acts that Congress's "clear and manifest" intention was not to repeal the drainage requirements of the San Luis Act, but merely to order the Secretary, in fulfilling those obligations, to develop a plan that addresses the environmental problems posed by the discharge of agricultural effluent.

Second, the appropriations provisos do not irreconcilably conflict with section 1(a) of the San Luis Act. The San Luis Act expressly requires the Department of the Interior to provide necessary drainage. The appropriations riders merely prevent the use of funds to determine the final point of discharge *until* the Secretary and the State of California develop a water quality plan. Examination of the language of the appropriations provisos shows that none of them warranted, let alone compelled, the Secretary to halt construction of the drainage facilities, or to stop drainage service. The Department's duty to

---

**3.** The *TVA* Court clarified that when legislators vote on appropriations measures, they "are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every

appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure." *Tennessee Valley Authority,* 437 U.S. at 190, 98 S.Ct. 2279.

develop a water quality plan before selecting the terminus of the interceptor drain simply does not conflict with its duty to provide drainage service under the San Luis Act. Thus, based on *Tennessee Valley Authority*,[4] we hold that the appropriations acts did not implicitly repeal the drainage provisions of the San Luis Act.

The Government and Intervenors seek application of *Friends of the Earth v. Armstrong*, 485 F.2d 1, 9 (10th Cir.1973). In *Friends of the Earth*, the Tenth Circuit held that the appropriations riders in issue, *in addition to an exhaustive Congressional debate*, amounted to "reversal of a previous [legislative] provision." 485 F.2d at 9. Unlike the instant case, the appropriations proviso in *Friends of the Earth* directly contradicted language of the authorizing act,[5] and committee reports accompanying the appropriations provisions described "the considerations examined and evaluated by Congress and the reasons for the actions taken." *Id.* The Tenth Circuit thus reached the conclusion that *Friends of the Earth* was "not really a situation of repeal by implication ... but more a reversal of a previous position after considering it fully in the public hearings." *Id.* Since there is no such direct conflict in this case, we find *Friends of the Earth* inapposite. Moreover, the Government's

reliance on other cases that involve direct conflicts between the authorizing acts and the appropriations acts, *see U.S. v. Dickerson*, 310 U.S. 554, 561, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940) (repeated yearly enactment of an appropriations law, denying funds to payment of re-enlistment allowances, had the effect of suspending the right to the allowance during the affected year); *Preterm, Inc. v. Dukakis*, 591 F.2d 121, 134 (1st Cir.1979) (applying implicit repeal to an appropriations measure where members of Congress were informed that their approval would change the Medicaid Act), is equally unpersuasive. Consequently, the district court properly held that the appropriations riders, without more, failed to repeal the Secretary's duty to provide drainage under the San Luis Act.

■ Having found that the Secretary's obligation to provide drainage under the San Luis Act has not been repealed by the appropriations acts, we now must examine whether the district court was correct in finding that the Secretary has been derelict in failing to fulfill those obligations. The appropriations riders direct the Department of the Interior to develop a plan with the State of California to minimize the detrimental effect of the San Luis

---

4. The dissent would distinguish *TVA* in two ways. First, the dissent argues that the appropriations bill in *TVA* made no mention of the Endangered Species Act, whereas here the appropriations act specifically mentions the San Luis Act. *See* dissent at 579–80. We do not see this as a meaningful distinction. Even though the appropriations acts reference the San Luis Act, they do not *conflict* with the San Luis Act, and their references to the San Luis Act are thus immaterial to the *TVA* inquiry. Second, the dissent argues that the vitality of the San Luis Act depends on the appropriations acts, whereas in *TVA* the Endangered Species Act would continue to have effect regardless of whether the appropriation bills had passed. *See* dissent at 579–80. Again, however, this distinction does not prevent our reliance on *TVA*. In this case, Congress did not deny funding of the San Luis Act, or of its drainage provisions—it merely placed a condition on the use of funds to determine the terminus of the drain. Thus,

although the dissent's second distinction might have been persuasive had Congress denied *all* funding for the drainage provisions of the San Luis Act, that simply did not occur. Therefore, the dissent's factual premise for this distinction is flawed.

5. In *Friends of the Earth*, the 1956 Colorado River Storage Act directed the Secretary of the Interior to "take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument" by water from Lake Powell. 43 U.S.C. § 620. However, subsequent appropriations measures clearly stated that "no part of the funds herein appropriated shall be available for construction or operation of facilities to prevent waters of Lake Powell from entering any National Monument." 1962 Appropriation Act, Pub.L. No. 87–330, 75 Stat. 724, 726 (1961). Such a direct conflict is patently absent from the legislation at issue in this case.

Drainage water. The Government provides no explanation why the Bureau of Reclamation and the State of California have been unable to establish the requisite environmental standards sometime during the past thirty-four years. In the meantime, for the past thirteen years the Department has been providing water service to the Westlands, but no drainage. As a result, the lands within Westlands are rapidly becoming sterile. Based on these facts, we agree with the district court that the Secretary of Interior, through the Bureau of Reclamation, has made the policy decision not to provide drainage service, in violation of section 1 of the San Luis Act.

■ This finding, however, does not end the inquiry. The Government contends that Congress, through actions taken after the San Luis Act, has encouraged the Department of Interior to investigate and pursue drainage solutions other than the interceptor drain contemplated by the San Luis Act. Since the late 1970s, Congress has appropriated funds so that the Bureau of Reclamation could, in cooperation with the State, local water districts, and other entities, examine solutions to drainage other than the construction of the master drain.[6] We reject the Government's contention that this action has eliminated the Bureau's duty to provide drainage; however, we do find that the subsequent Congressional action supplements the drainage solutions available to the Department of the Interior. *See City of Los Angeles v. Adams,* 556 F.2d 40, 50 (D.C.Cir.1977); *Skoko v. Andrus,* 638 F.2d 1154, 1158 (9th Cir.1979); *District of Columbia v. Potomac Elec. Power Co.,* 402 A.2d 430, 435–36 (D.C.1979). If, as the district court concluded, the interceptor drain was the only method through which the Department could meet its drainage obligations under the San Luis Act, then the alternative drainage solutions that Congress has sup-

ported for years would be superfluous. Thus, although the San Luis Act limits the drainage solution to an interceptor drain to the Contra Costa Delta, the subsequent Congressional action indicates that the Department of the Interior can meet its drainage obligations through means other than the interceptor drain. Therefore, we hold that the subsequent Congressional action has not eliminated the Department's duty to provide drainage, but that it has given the Department the authority to pursue alternative options other than the interceptor drain to satisfy its duty under the San Luis Act.

**IV The District Court's Order**

■ At the conclusion of the bench trial, the district court ordered the Department of Interior and the Bureau of Reclamation to "take such reasonable and necessary actions to promptly prepare, file and pursue an application for a discharge permit," with the California Water Resources Control Board. *Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* No. CV–F–91–048; *Firebaugh Canal Co. v. USA,* No. CV–F–88–634 (E.D.C.A. Mar. 10, 1995). The Government contends that the district court's order oversteps the broad discretion given to the Department of Interior with regard to providing a drainage solution for the San Luis Unit. We agree.

■ Under the Administrative Procedure Act, a district court, "shall ... compel agency action unlawfully withheld." 5 U.S.C. § 706(1) (West 1996). Government inaction despite a statutory mandate may support a mandatory injunction issued by the court. In *Houseton v. Nimmo,* 670 F.2d 1375 (9th Cir.1982), we affirmed the district court's order compelling agency action after 16 months of unlawful inaction. This Court ruled that the lower court's findings of "unreasonable delay and serious prejudice" were proper. *Id.* at 1378.

---

6. *See* "Reclamation Wastewater and Groundwater Study and Facilities Act of 1992", Pub.L. No. 102–575, §§ 1601–1617, 106 Stat. 4600, 4663 (1992) (enacting 43 U.S.C. §§ 390h to 390h–15 (West Supp.1997)); "Central Valley Project Improvement Act", *id.* at §§ 3401–3411, 106 Stat. 4600, 4706.

Although we conclude that the Department of Interior has a duty to provide drainage service under the San Luis Act, subsequent Congressional action has given discretion to the Department in creating and implementing a drainage solution. Since 1986, the Department of Interior has withheld drainage service from the Westlands Water District, in violation of section 1 of the San Luis Act. The lack of drainage service has seriously diminished the viability of agricultural land within Westlands, including certain locations where the land is completely sterile. This action constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1) and *Houseton.*

Although the district court can compel the Department of Interior to provide drainage service as mandated by the San Luis Act, the district court cannot eliminate agency discretion as to how it satisfies the drainage requirement. By ordering the Department of Interior to apply for a discharge permit, the district court precludes other, non interceptor-drain, solutions to the drainage duty created by the San Luis Act.

However, we agree with the district court that the Department of Interior must act to provide drainage service. The Bureau of Reclamation has studied the problem for over two decades. In the interim, lands within Westlands are subject to irreparable injury caused by agency action unlawfully withheld. Now the time has come for the Department of Interior and the Bureau of Reclamation to bring the past two decades of studies, and the 50 million dollars expended pursuing an "in valley" drainage solution, to bear in meeting its duty to provide drainage under the San Luis Act.

## CONCLUSION

We affirm the district court's conclusion that the Government must act promptly to provide drainage service, but reverse that part of the judgment that forecloses non-interceptor drain solutions. We remand the case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

Each party is to bear its own costs.

TROTT, Circuit Judge, Dissenting:

I conclude from this lengthy record that Judge Hug is correct when he says that, "any water project which brings fresh water to an agricultural area [with a layer of clay under the soil] must take the salty water remaining after the crops have been irrigated away from the service area." A failure to take this obvious step leads inexorably to the spoilation of the agricultural capacity of the land intended to be benefitted by the irrigation project. What is happening to the land here is akin to putting clothes from a washing machine without a rinse cycle directly into a dryer. Not only will the clothes emerge still dirty, but they will eventually be destroyed. Unfortunately, I'm afraid the majority opinion does similar damage to our legislative process that requires first the authorization of Executive Branch activity, and then the appropriation of money to pay for it.

Congress and various agencies of our government have failed for many years to come to grips with the difficult issues in this case, issues arising primarily from legitimate environmental concerns such as what the effluent from the project would do to the San Francisco Bay. The Kesterson Reservoir experience and its incompatibility with the Migratory Bird Treaty Act and other valid health and safety concerns proves once again that for every benefit, there is a cost somewhere that must be borne by someone.

As far as I can tell, when some of the downstream costs of the San Luis Unit became apparent, Congress hit half the brakes, allowing needed irrigation to continue, but blocking the removal of the waste water by an interceptor drain until a plan could be developed that would meet environmental and water quality require-

ments. As I read the law, Congress' studied and specific instructions on this thorny issue are dispositive and extinguish or excuse any obligation of the Secretary of the Interior to go ahead—at any level—with the interceptor drain. In the first place, nothing in the plain language of the Act *requires* the construction of a master, or a central, drain. The Act merely *authorizes* the Secretary to include necessary drains and to make provisions for the construction of a master drain. An authorization is not a mandate. The best one can say for the construction of the Act offered by the Appellees is that the statute is ambiguous, which means that we must defer to the Secretary's construction of it. With all respect to the majority, the "mandatory" language they seize upon to support a different result relates only to "principal engineering features," not to any order that the master drain must be built.

In any event, Congress' explicit actions on this subject over a thirty-year period are very revealing. When push comes to shove, it is the *appropriations* bills that count, and here, Congress has blocked construction in nearly every appropriations bill for the Bureau of Reclamation for thirty years. The relevant appropriations bills *prohibit* the Secretary from selecting "the final point of the discharge for the interceptor drain for the San Luis Unit until development by the Secretary of the Interior and the State of California of a plan, which shall conform to the water quality standards of the State of California as approved by the Administrator of the EPA, to minimize any detrimental effect of the San Luis drainage waters." Pub.L. No. 105–62, at § 510(a), 111 Stat. 1320, 1340 (1997); Pub.L. No. 104–206, Stat. 2984, 3002 (1996). Under the circumstances, we exceed our authority to order the expenditure of public funds in the face of Congress' orders that such funds not be spent for this purpose. Article 1, Section 9 of our Constitution, which provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by law," would appear to block

the result reached first by the district court, and now by us.

With all respect, the majority opinion is not correct in its claim that *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), commands a different result. In *TVA,* the appropriations bill in question had the effect of causing a project to go forward. When conflict with a statute not mentioned in the appropriations bill became apparent, the Court held that the *appropriations bill could not impliedly repeal the former statute. Id.* In the instant case, however, the appropriations bill has a negative effect, that of causing a project to halt unless the specific requirement of the appropriation is met.

Two features of the instant case distinguish it from *TVA.* First, the 1960 Act is specifically mentioned in the appropriations bill, while in *TVA,* the appropriations bill made no mention of conflicting Endangered Species Act. *See TVA,* 437 U.S. at 189 & n. 35, 98 S.Ct. 2279. Second, in the instant case the Act being repealed depends for its vitality on the appropriations bill itself, while in *TVA,* the ESA would continue to have effect whether or not the appropriation had passed. Because of this second distinction, the government's citation of *Friends of the Earth v. Armstrong,* 485 F.2d 1, 7–8 (10th Cir.1973), is apposite. In that case, the Tenth Circuit held that the appropriations' act denial of funds to implement the requirements of the prior act represented a congressional choice. *Id.* at 8. ("This indicates that Congress reached the decision not to modify the planned operation of the Glen Canyon Dam nor to authorize protective works to be built.").

The government is correct that the Secretary must have appropriated monies to go ahead with the 1960 Act's mandates. Appropriated monies are not available to build the interceptor drain until the Secretary of the Interior and the State of Cali-

fornia develop a plan, as required by the riders to the appropriations bills.

After spending months with this record, I'm not at all sure we can find the right answer to the puzzle. The pieces are strewn over half a century, and they appear to have been cut by Congress from competing pieces of wood with no reference to a coherent design. We have been left with pieces that cannot be assembled to produce any picture at all, much less the one on the box. The Feasibility Report for this project was prepared by the Secretary of the Interior in 1956—when Dwight D. Eisenhower was the President of the United States. In 1965, Congress used an appropriations rider to slow it down. In 1975, twenty-five years ago, the construction of the interceptor drain project went into a stall because of "questions" and "concerns" raised in the public arena; and in 1985, it was stopped dead because of the Kesterson disaster.

The thorny problem of what to do with the noxious effluent is not readily susceptible of a solution that the parties with competing interests will find acceptable. In fact, the question in search of an answer has become a political question beyond our ability, competence, and authority to resolve. It is tempting to turn to the courts when Congress falters or refuses to act, but not appropriate under our Constitution's allocation of powers.

One can only have sympathy for the plight of the farmers and families this irrigation project was intended to benefit, for it seems now that the well-intentioned project threatens to destroy their lands. Equally valid are the fears of those who may be burdened by the effluent from this initiative. Nevertheless, the answer to their plight lies outside our power to act. It is to Congress and the State of California to which those concerned must turn and then hope that the difficult policy choices we in the judiciary are not equipped to make can be made in those fora.

Accordingly, I respectfully dissent.