**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN LUIS UNIT FOOD PRODUCERS;
EL DORADO FARMS; LAGUNA
EXCELSIOR FARMS, LLC; JLK; RYAN
FAMILY FARMS LP; MARLU FARMS;
SIMCOT FARMS; BRAD GLEASON;
ROSS ALLEN; CALIFORNIA
PISTACHIO LLC; DOUBLE B. FARMS;
BUSTER ALLEN, INC.; TURK STATION
LLC; C.S. STEFANOPOULOS; ELENA
STEFANOPOULOS; D. D.
STEFANOPOULOS; PAGONA
STEFANOPOULOS; UNIVERSAL LAND
CO.; CORT BLACKBURN; LAURA
BLACKBURN; MC FARMS LLC;
MARTY ACQUISTAPACE; CURTIS
STUBBLEFIELD,

        *Plaintiffs-Appellants*,

        v.

UNITED STATES OF AMERICA;
DEPARTMENT OF THE INTERIOR;
BUREAU OF RECLAMATION,
        *Defendants-Appellees*.

No. 11-16122

D.C. No.
1:09-cv-01871-
OWW-DLB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
December 5, 2012—San Francisco, California

Filed March 1, 2013

Before: Stephen S. Trott and Johnnie B. Rawlinson,
Circuit Judges, and Frederic Block, District Judge.[*]

Opinion by Judge Trott

## SUMMARY[**]

### Water Rights

The panel affirmed the district court's judgment in favor of the United States Bureau of Reclamation in an action brought by farmers under the Administrative Procedure Act seeking to compel the Bureau to provide irrigation districts with more water.

---

[*] The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the Bureau was not legally required to take a discrete action to deliver the farmers' preferred amount of water from the San Luis Unit of the Central Valley Project for irrigation before it provides water for other purposes. The panel held that there was no final agency action, nor was there any action that the Bureau had unlawfully withheld. The panel concluded that the farmers had not established subject matter jurisdiction under the Administrative Procedure Act.

## COUNSEL

Theodore A. Chester, Jr., Smiland & Chester, Los Angeles, California, for Plaintiffs-Appellants.

Peter Krzywicki and Michael T. Gray, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

## OPINION

TROTT, Circuit Judge:

Today we consider whether farmers and farming entities (collectively, "Farmers") that irrigate their land using water from the San Luis Unit of the Central Valley Project – the nation's largest reclamation project – may maintain a claim under the Administrative Procedure Act ("APA") to compel the United States Bureau of Reclamation ("the Bureau") to provide the Farmers' irrigation districts with more water than it is currently providing. The Farmers argue that several federal statutes require the Bureau to provide irrigators with

sufficient irrigation water to satisfy the Farmers' needs before delivering water to any other party for any other purpose. The district court granted summary judgment in favor of the Bureau on several grounds, including that the Bureau does not have a statutory duty to release a certain amount of water for irrigation and that, consequently, the Farmers' claims did not satisfy the final agency action requirement of the APA. Although the district court discussed this issue in terms of sovereign immunity, we resolve the case slightly differently.

Pursuant to the Supreme Court's unanimous decision in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55 (2004), we hold that the Bureau is not legally required to take a discrete action to deliver the Farmers' preferred amount of San Luis Unit water for irrigation before it provides water for other purposes. The Bureau retains the discretion to allocate San Luis water among various parties to satisfy its various obligations. There is no final agency action, nor is there any action that the Bureau has unlawfully withheld. *See* 5 U.S.C. §§ 704 & 706(1). The Farmers' claims amount to a broad programmatic attack on the way the Bureau generally operates the Central Valley Project, *see SUWA*, 542 U.S. at 64, and therefore the Farmers have not established subject matter jurisdiction under the APA,[1] *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1019–20 (9th Cir. 2007).

---

[1] We express no opinion on the district court's other reasons for dismissing the Farmers' claims.

# I

Reclamation projects are indispensable features of agriculture in the Western United States. "The Reclamation Act of 1902 set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States." *Orff v. United States*, 545 U.S. 596, 598 (2005); *see generally* 43 U.S.C. §§ 371-600e. When the Department of the Interior decides to build and operate a reclamation project, the agency must "appropriate, purchase, or condemn necessary water rights in strict conformity with state law." *California v. United States*, 438 U.S. 645, 665 (1978). As the Farmers acknowledge, the Bureau obtained all of the water rights involved in the San Luis Unit "in the 1960s under both federal and state law." Op. Br. at 36.

The Central Valley Project ("CVP") is "a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure [that] distributes water throughout California's vast Central Valley." *Orff*, 545 U.S. at 598. The CVP was originally "taken over and executed" by the United States under the Reclamation Act and was reauthorized by the Rivers and Harbors Act of 1937, Pub. L. No. 75-392, 50 Stat. 844, 850 ("the CVP Act"). *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1095 n.3 (9th Cir. 2003). The Bureau is the agency within the Department of the Interior charged with administering the CVP.

Congress initially prioritized the purposes of the CVP as follows: "[T]he said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; *second, for irrigation* and domestic uses; and, third,

for power." CVP Act § 2 (1937) (emphasis added). However, Congress amended the CVP Act in 1992 with the Central Valley Project Improvement Act, Pub. L. No. 102-575, 106 Stat. 4600 ("CVPIA"), which re-prioritized the purposes of the CVP. *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995). The hierarchy of purposes now reads, "[T]he said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; *second, for irrigation* and domestic uses *and fish and wildlife mitigation, protection and restoration purposes*; and, third, for power and fish and wildlife enhancement." CVPIA § 3406(a)(2) (emphasis added); CVP Act § 2. The CVPIA also requires that the Bureau operate the CVP to "meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, *et seq.*" CVPIA § 3406(b).

In 1960, Congress authorized the Secretary of the Interior to construct and operate the San Luis Unit "as an integral part" of the CVP. Act of June 3, 1960, Pub. L. No. 86-488, § 1(a), 74 Stat. 156, 156 ("the San Luis Act"). The San Luis Act (1) states that the "principal purpose" of the Unit is to furnish water for irrigation and (2) identifies four "incident[al]" purposes – among them, "fish and wildlife benefits." *Id.* The San Luis Act also provides that "[t]he principal engineering features of said Unit shall be a dam and reservoir at or near the San Luis site, a forebay and afterbay, the San Luis Canal, the Pleasant Valley Canal, and necessary pumping plants, distribution systems, drains, channels, levees, flood works and related facilities." *Id.*

The Reclamation Act authorizes the Bureau to enter into contracts for the use of reclamation water for several

purposes, including irrigation. *See* 43 U.S.C. §§ 423e & 521. As is relevant here, the Bureau contracts with irrigation districts for the delivery of water from the San Luis Unit. Each contract contains a shortage provision excusing the Bureau from the full amount of its contractual water delivery obligations if water shortages are caused by, among other things, drought, mechanical malfunctions, or statutory obligations on the part of the Bureau to deliver water for other purposes – such as obligations imposed by the Endangered Species Act and the CVPIA. Once the Bureau contracts with an irrigation district, the district in turn contracts with end-users like the Farmers.

According to the Bureau's Deputy Regional Resources Manager, every year the Bureau projects the amount of CVP water that will be available "based upon reservoir storage, precipitation, runoff forecasts, and other indices." Decl. of Richard Stevenson, April 26, 2010, ¶ 5. It then allocates that water among the Bureau's contractors, including irrigation districts and wildlife refuges.

The Farmers allege that for decades the Bureau delivered enough water to the irrigation districts – which then sold the water to the Farmers – for the Farmers to irrigate 100% of their lands to their satisfaction. But in the last several years the Bureau has provided less water for irrigation, allocating substantial amounts of San Luis water for other purposes – particularly for the protection and restoration of fish and wildlife. The Bureau also allows a significant volume of water to flow naturally, rather than capturing it to be used for irrigation. According to the Farmers, the Bureau has unlawfully "transmute[d] the Unit from an irrigation project into a fish and wildlife enterprise." Op. Br. at 8.

The Farmers filed suit under the APA in the United States District Court for the Eastern District of California.  The Farmers contended that the Bureau is required by federal law to deliver more water for irrigation and less water for non-irrigation purposes such as fish and wildlife.  They claim they are entitled to the amount of water that they have historically put to beneficial use – presumably making this historical measurement sometime before the Bureau began curtailing its deliveries of irrigation water.  At oral argument, counsel for the Farmers estimated this amount as approximately 1,000,000 acre-feet, at least in times when there is no water shortage.

The Bureau moved for judgment on the pleadings, and the Farmers moved for summary judgment.  The district court granted the Bureau's motion, denied the Farmers' motion, and granted summary judgment to the Bureau.  The district court determined that with respect to most of the statutory provisions cited by the Farmers, (1) the Bureau did not have a mandatory duty to act to provide a certain amount of irrigation water, (2) the Farmers thus did not satisfy the final agency action requirement of the APA, and (3) the Farmers' claims were therefore barred by the doctrine of sovereign immunity.  The court held in the alternative that the Farmers lacked prudential standing.  With respect to four of the Farmers' claims, the district court held that the Farmers lacked constitutional standing.

The Farmers timely appeal.

## II

We review de novo the district court's interpretation of federal statutes such as the Reclamation Act, the CVP Act, and the San Luis Act. *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573 (9th Cir. 2000). When interpreting a statute, "our starting point is the plain language of the statute." *Consejo de Desarrollo Economico de Mexicali v. United States*, 482 F.3d 1157, 1168 (9th Cir. 2007). That plain meaning controls "except when its application leads to unreasonable or impracticable results." *De Osorio v. Mayorkas*, 695 F.3d 1003, 1013 (9th Cir. 2012) (en banc) (internal quotation marks omitted).

Where no other statute provides for judicial review of agency action, as is the case here, the APA allows challenges to final agency action. Agency action includes a "failure to act." 5 U.S.C. § 551(13). The Farmers do not challenge a specific water allocation by the Bureau. Rather, they allege that the Bureau has generally failed to deliver enough water to the irrigation districts for those districts to sell sufficient water to the Farmers. In such a "failure to act" case, a court can "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

The Supreme Court explained the requirements of § 706(1) in *SUWA*. In that case, the Court considered an APA claim that the Bureau of Land Management ("BLM") violated several statutory provisions by failing to take action with respect to off-road vehicle use on federal land. 542 U.S. at 60–61. Noting that a "failure to act" within the meaning of the APA is the failure of the agency to issue an "agency rule, order, license, sanction or relief," *id.* at 62, the Court held that

judicial review of a failure to act under § 706(1) "is properly understood to be limited . . . to a *discrete* action," *id.* at 63 (internal quotation marks and alteration omitted).  "General deficiencies in compliance . . . lack the specificity requisite for agency action," *id.* at 66, and thus "broad programmatic attack[s]" on an agency's administration of a program are prohibited, *id.* at 64.

The Court also explained that even discrete agency action cannot be compelled under § 706(1) unless that action is "demanded by law."  *Id.* at 65.  Statutory goals that are "mandatory as to the object to be achieved" but leave the agency with "discretion in deciding how to achieve" those goals are insufficient to support a "failure to act" claim because such discretionary actions are not "demanded by law."  *Id.* at 66.

Therefore, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take."  *Id.* at 64.  "Absent such an assertion, a Section 706(1) claim may be dismissed for lack of jurisdiction."  *Alvarado*, 509 F.3d at 1019–20; *see also Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006) (upholding the district court's dismissal of an APA claim for lack of jurisdiction because the government was not required "to take discrete nondiscretionary actions").

With these standards in mind, we turn to the Farmers' claims.

### III

The Farmers have no contractual rights with the Bureau to irrigation water obtained as a result of its reclamation works, and the Farmers do not contend that they are third-party beneficiaries of the Bureau's contracts with the irrigation districts. *See Orff*, 545 U.S. at 597–98, 603–04 (holding that the government had not waived its sovereign immunity with respect to suits brought by farmers claiming third-party beneficiary status); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1209, 1211–12 (9th Cir. 1999) (construing contract between the Bureau and the California Oregon Power Company and holding that irrigators were not intended third-party beneficiaries).

Rather than basing their claims in contract, the Farmers argue that various reclamation statutes independently impose mandatory obligations upon the Bureau to distribute more water to the irrigation districts. The Farmers contend they are entitled to whatever amount of water they historically put to beneficial use and that the Bureau may use only "surplus" water for any purpose other than irrigation. Op. Br. at 20.

The Farmers divide their claims into three groups. They contend that the Bureau is violating statutory duties (1) to "operate" the San Luis Unit in a manner that fully utilizes it for irrigation above other purposes, (2) to "exercise" its water rights to San Luis water, and (3) to "recoup Project costs." Op. Br. at 16, 27, 39. We conclude that none of the statutes identified by the Farmers requires the Bureau to take a discrete nondiscretionary action.

**A**

We first consider whether four federal statutes impose on the Bureau a mandatory duty to "operate" the CVP so as to provide the Farmers with their preferred amount of water.

**1**

Section 521 of Title 43 of the United States Code authorizes the Secretary "to enter into contract to supply water from any project irrigation system for *other purposes than irrigation*" provided that "no water shall be furnished for the uses aforesaid if the delivery of such water shall be detrimental to the water service for such irrigation project, nor to the rights of any prior appropriator."  43 U.S.C. § 521 (emphasis added).  The Farmers rely on § 521 to argue that their lands are suffering just such a detriment and that, therefore, the Bureau must operate the San Luis Unit to provide them with more irrigation water before distributing water for non-irrigation purposes.

The fatal flaw in the Farmers' argument is that although they allege generally that they are being harmed by the Bureau's practice of allocating water for the protection of fish and wildlife – a purpose which, like irrigation, the Bureau is required to promote under the CVPIA – they have not identified a single contract as a cause of that harm.  Further, the statute does not describe any specific action the Bureau is required to take in the event an irrigator claims detriment resulting from a non-irrigation reclamation contract.  Thus, without addressing the Farmers' argument that they are prior appropriators within the meaning of § 521, we conclude that these claims fail for lack of a discrete statutory duty.

**2**

The Farmers next cite section 2 of the CVP Act, which provides for "the sale of electric energy" generated by the CVP "in order to permit the full utilization of the works constructed" to accomplish the CVP's purposes. Because section 2 also states that "the CVP dam and reservoirs 'shall be *used*,' after river regulation, for 'irrigation' and other '*uses*,'" the Farmers claim the entire infrastructure of the CVP must be "used" for irrigation before the Bureau may distribute water for non-irrigation purposes. Op. Br. at 22 (quoting CVP Act § 2) (emphasis added).

The statute, as amended by the CVPIA, lists the purposes of the CVP – e.g., improving navigation, river regulation, irrigation, fish and wildlife protection and restoration, etc. – and authorizes the sale of electricity to accomplish those purposes. Section 2 does not indicate in the slightest that the Bureau *must* take any nondiscretionary action, much less deliver a certain amount of water to its irrigation contractors so that those contractors can then sell it to the Farmers.

**3**

The Farmers also rely on the second sentence of section 1(a) of the San Luis Act, which states that the "principal engineering features" of the San Luis Unit "shall be a dam and reservoir . . . and necessary pumping plants, distribution systems, drains, channels, levees, flood works and related facilities." The Farmers rely on our decision in *Firebaugh Canal* for the proposition that this statutory language creates a mandatory duty to distribute more water for irrigation.

*Firebaugh Canal* involved a challenge to the Secretary of the Interior's failure to complete construction of a master interceptor drain for the San Luis Unit. 203 F.3d at 571–72. The majority held that because section 1(a) of the San Luis Act states that the principal engineering features of the San Luis Unit "shall" include "necessary . . . drains," the agency was required to construct the interceptor drain. *Id.* at 573–75. *Firebaugh Canal* described the government's responsibility under § 1(a) as a mandatory "duty to provide drainage service" and held that providing such service "constitute[d] agency action unlawfully withheld under § 706(1)." *Id.* at 570, 578. Although the majority held that "the district court can compel the Department of Interior to provide drainage service as mandated by the San Luis Act," it recognized that "the district court *cannot eliminate agency discretion as to how it satisfies the drainage requirement*." *Id.* at 578 (emphasis added).

The Farmers argue that section 1(a), as interpreted in *Firebaugh Canal*, requires the Bureau to distribute the Farmers' preferred amount of irrigation water before it engages in any fish and wildlife protection efforts. We disagree that *Firebaugh Canal* stands for so attenuated a proposition. Section 1(a) of the San Luis Act simply describes the necessary engineering features of the San Luis Unit, and *Firebaugh Canal* simply holds that the agency was required to construct the interceptor drain. Neither the statute nor *Firebaugh Canal* says anything in terms of a duty to distribute a particular amount of water for irrigation.

Moreover, because *Firebaugh Canal* was decided before the Supreme Court decided *SUWA*, we did not then consider whether "provid[ing] drainage service" would have

constituted a *discrete* agency action. *Id.* at 578. The case likely would have come out differently, because – as we acknowledged – the Bureau has discretion under section 1(a) to decide *how* to provide drainage service. However, we need not determine whether *Firebaugh Canal* remains good law after *SUWA*, because even assuming it does, the Farmers do not dispute that the Bureau *is* providing water for irrigation – just not as much as they would like.

**4**

The Farmers' last "operation" claim is based on section 6 of the Reclamation Act, codified at 43 U.S.C. § 491. Section 491 "authorize[s] and direct[s]" the Secretary of the Interior "to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed" under the Reclamation Act.

The Farmers assert that the word "operation" means "utilization of the works as fully as practicable." Op. Br. at 18. The argument goes as follows: Because the Reclamation Act deals with *irrigation* projects, those projects must be operated as fully as practicable *for irrigation* before they can be used for non-irrigation purposes.

The Farmers would have us ignore every word in the statute other than the word "operation." Section 491 does not require the Bureau to take any particular action in its management of its reclamation projects. It simply provides that the Bureau will use a dedicated funding source – which was established by § 1 of the Reclamation Act, 43 U.S.C. § 391 – for whatever action it chooses to take. Decisions on how to operate the CVP are left to the Bureau's discretion and

thus cannot be compelled under § 706(1).  *See SUWA*, 542 U.S. at 64.

**B**

We next address the Farmers' claims that the Bureau has violated its alleged duty to exercise its water rights within the San Luis Unit.

**1**

The Farmers rely on section 8 of the Reclamation Act, codified in part at 43 U.S.C. § 383, and section 1702 of the California Water Code.  Section 8 states in part,

> Nothing in this Act shall be construed as affecting . . . the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws . . . .

43 U.S.C. § 383.  This section requires that the Bureau comply with "any condition on the 'control, appropriation, use, or distribution of water' through a federal reclamation project that is not inconsistent with clear congressional directives respecting the project." *California*, 438 U.S. at 672 (quoting 43 U.S.C. § 383).  Thus, state law restrictions on the Bureau's water use are incorporated into the Reclamation Act so long as they are consistent with other federal law.

The Farmers claim that the Bureau's failure to release more water to the irrigation districts violates section 1702 of the California Water Code.  Under California law, a permit holder may apply to the State Water Resources Control Board ("Board") for a change in the "purpose of use."  Cal. Water Code § 1701.  Section 1702 states that the Board may not grant any such application unless it finds that the permit holder has "establish[ed] to the satisfaction of the [B]oard . . . that the change will not operate to the injury of any legal user of the water involved."  Cal. Water Code § 1702.  According to the Farmers, this "no injury" rule requires that the Bureau deliver their preferred volume of irrigation water because the amount of water they currently receive from the irrigation districts is insufficient to irrigate all of their lands.

We disagree.  The plain meaning of section 1702 requires that the *Board* make a "no injury" finding prior to approving a change in a water permit.  It does not instruct the Bureau to do anything.

**2**

The Farmers' next claim regarding the Bureau's alleged duty to exercise its water rights relies on another part of section 8 of the Reclamation Act.  Originally enacted as a proviso to section 8 and now codified at 43 U.S.C. § 372, the statute provides that "[t]he right to the use of water acquired under [the Reclamation Act] shall be appurtenant to the land irrigated, and *beneficial use shall be the basis, the measure, and the limit of the right*."  43 U.S.C. § 372 (emphasis added).

Section 372 is the Farmers' answer to the conundrum that nowhere within the many statutes upon which they rely does

there appear any language specifying the amount of water to which the Farmers are supposedly entitled.  They claim that under § 372 they are entitled to that amount of water they have beneficially used each year when the Bureau allocated enough water for the Farmers to irrigate 100% of their lands.

Whether or not the Farmers can be considered as having rights under the Reclamation Act when they do not hold contracts with the Bureau for the provision of irrigation water, the statement that the beneficial use of water is the "measure" of a water right is simply too vague to be construed as a congressional directive to the Bureau to take a discrete action such as delivering the Farmers' preferred amount of irrigation water.  The amount of water the Farmers want is just that – the amount that they *want*, not an amount to which they are legally entitled.  Simply put, to refer to § 372 as requiring a "discrete" action is to distort the meaning of the word.

**3**

The Farmers' last "exercise" claim rests on the final sentence of section 1(a) of the San Luis Act, which provides in relevant part:

> Construction of the San Luis unit shall not be commenced until the Secretary has . . . secured, or has satisfactory assurance of his ability to secure, all rights to the use of water which are necessary to carry out the purposes of the unit and the terms and conditions of this Act . . . .

San Luis Act § 1(a).

The Farmers concede that the Bureau acquired the necessary water rights long ago and agree that it "duly exercised the rights for decades." Op. Br. at 39. They contend, however, that the Bureau's "current non-irrigation use, and even non-use, of the water is impermissibly rendering the rights insecure." *Id.*

By its plain terms, this statute imposes a condition only on the *construction* of the San Luis Unit. Before the Unit could be built, the Bureau had to acquire the necessary water rights – which it did. There is nothing in the statute even remotely suggesting that the Bureau must deliver a certain amount of irrigation water prior to engaging in fish and wildlife protection efforts.

## C

Finally, the Farmers contend that various statutes require the Bureau to sell more irrigation water to recoup the costs of constructing, operating, and maintaining the CVP. None of the statutes helps the Farmers.

Congress intended that reclamation projects would recoup their own costs by requiring payments from those who benefit from the federal government's reclamation efforts. Landowners who irrigate their land with reclamation water must pay an operation and maintenance charge "whenever water service is available for the irrigation of his land." 43 U.S.C. § 492. Charges to recoup the cost of construction "shall be determined *with a view* of returning to the reclamation fund the estimated cost of construction of the project." 43 U.S.C. § 461 (emphasis added). The Bureau must provide notice of "the charges which shall be made per

acre upon" the land to be irrigated, "the number of annual installments in which such charges shall be paid[,] and the time when such payments shall commence." 43 U.S.C. § 419.

The Reclamation Act also states that contracts with irrigation districts for the delivery of irrigation water "shall be . . . at such rates *as in the Secretary's judgment* will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges *as the Secretary deems proper*." 43 U.S.C. § 485h(e) (emphasis added).  Any such contract must "provid[e] for payment by the district or districts of the cost of constructing, operating, and maintaining the works . . . , such cost of constructing to be repaid within such terms of years *as the Secretary may find to be necessary*, in any event not more than forty years." 43 U.S.C. § 423e (emphasis added).

As the above-emphasized language illustrates, Congress unmistakably vested with the agency the discretion to determine how to recoup the costs of irrigation projects.  In passing the recoupment statutes, Congress's goals were broad and general – "the rehabilitation of the several reclamation projects and the insuring of their future success by placing them upon a sound operative and business basis."  43 U.S.C. § 423f.  Congress delegated to the Secretary of the Interior, and by extension to the Bureau, the discretion to determine the best way to meet those goals.  None of these recoupment statutes requires the discrete agency action the Farmers seek.  Therefore, the Farmers cannot compel the Bureau to act.

**IV**

In the end, the Farmers' claims boil down to a broad, programmatic challenge to the Bureau's operation and management of the CVP and, as such, are not cognizable under the APA. Although the Farmers contend that the CVP is designed to promote irrigation over the protection of fish and wildlife, Congress decided otherwise. The Bureau is tasked with "operat[ing] the Central Valley Project to meet *all* obligations under State and Federal law, including but not limited to the Federal Endangered Species Act." CVPIA § 3406(b) (emphasis added). That is a mandatory goal. The decision of how to achieve it, however, is the Bureau's. None of the statutes identified by the Farmers require that the Bureau deliver the Farmers' preferred amount of water to its irrigation contractors. For this reason, the Farmers' APA claims fail for lack of subject matter jurisdiction.

**AFFIRMED**.