**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FIREBAUGH CANAL WATER DISTRICT; CENTRAL CALIFORNIA IRRIGATION DISTRICT, *Plaintiffs-Appellants*, | No. 11-17715 |
| | D.C. Nos. 1:88-cv-00634-LJO-DLB 1:92-cv-05554-OWW 1:91-cv-00048-LJO-DLB |
| v. | |
| UNITED STATES OF AMERICA; DEPARTMENT OF INTERIOR; BUREAU OF RECLAMATION; KENNETH LEE SALAZAR; WESTLANDS WATER DISTRICT; PANOCHE WATER DISTRICT; BROADVIEW WATER DISTRICT; SAN LUIS WATER DISTRICT, *Defendants-Appellees*, | OPINION |
| NATURAL RESOURCES DEFENSE COUNCIL; THE BAY INSTITUTE; CONTRA COSTA COUNTY; CONTRA COSTA WATER AGENCY, *Intervenor-Defendants-Appellees.* | |

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
December 5, 2012—San Francisco, California

Filed April 5, 2013

Before: Stephen S. Trott and Johnnie B. Rawlinson, Circuit
Judges, and Frederic Block, District Judge.[*]

Opinion by Judge Block

---

**SUMMARY**[**]

---

**Water Rights**

The panel affirmed the district court's summary judgment
in favor of the United States Department of the Interior in an
action challenging Interior's management of California's
Central Valley Project.

The panel held that Interior's broad discretion in matters
of drainage precluded the Firebaugh Canal Water District and
the Central California Irrigation District's claims that a lack
of adequate drainage in part of the Central Valley Project
caused poor quality water flow into the District's service area,
and that Interior should be ordered to provide the necessary
drainage or pay money damages.    The panel also held that

---

[*] The Honorable Frederic Block, Senior United States District Judge for
the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Interior's discretion put Interior's actions beyond the scope of both the Administrative Procedure Act and Federal Tort Claims Act.

## COUNSEL

Paul R. Minasian, Minasian, Meith, Soares, Sexton & Cooper, LLP, Oroville, California, for Plaintiffs-Appellants.

Brian C. Toth, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C.; Daniel J. O'Hanlon and Eric N. Robinson, Kronick, Moskovtiz, Tiedemann & Girard, Sacramento, California, for Defendants-Appellees.

Hamilton Candee, Altshuler Berzon LLP, San Francisco, California; Katherine Poole, Natural Resources Defense Council, San Francisco, California; Laurens H. Silver, California Environmental Law Project, Mill Valley, California, for Intervenor-Defendants-Appellees.

## OPINION

BLOCK, District Judge:

The Central Valley Project ("CVP") is a massive undertaking to transfer water from the northern part of California's Central Valley to the relatively arid southern part of the valley. The project is managed by the United States Department of the Interior ("Interior").

Interior's management of the CVP has been the subject of much litigation. Here, we address the claim of the Firebaugh Canal Water District and the Central California Irrigation District (collectively, "Firebaugh") that a lack of adequate drainage in part of the CVP causes poor quality water to flow into its service area.

Firebaugh argues that Interior should be ordered to provide the necessary drainage or, alternatively, to pay money damages. For the reasons set forth below, we hold that Interior's broad discretion in matters of drainage precludes both claims.

# I

## A.  The San Luis Act

In 1960, Congress passed the San Luis Act, Pub. L. No. 86-488, 74 Stat. 156 (1960). The Act sought to "furnish[] water for the irrigation of approximately five hundred thousand acres of land in Merced, Fresno, and Kings Counties, California," by authorizing Interior to construct and maintain the San Luis Unit ("the Unit"). *Id.* § 1(a). The Unit was to include a dam and reservoir, along with "necessary pumping plants, distribution systems, drains, channels, levees, flood works, and related facilities." *Id.*

Aware that increased irrigation would increase drainage requirements, Congress conditioned construction of the Unit on "satisfactory assurance from the State of California that it will make provision for a master drainage outlet and disposal channel for the San Joaquin Valley." *Id.* Alternatively, the Unit could be constructed once Interior had "made provision for constructing the San Luis interceptor drain to the [Contra

Costa] delta designed to meet the drainage requirements of the San Luis unit." *Id.*  In addition, section 5 of the Act authorized Interior to "enter into agreements and participate in construction and operation of drainage facilities designed to serve the general area of which the lands to be served by the San Luis unit are a part, to the extent the works authorized in section 1 of this Act contribute to drainage requirements of said area."

When California declined to provide a master drainage outlet, Interior then informed Congress that it would build the drain.  Construction began thereafter and the Unit started making water deliveries in 1967.

Since 1965, Congress has prohibited Interior from using any of its annual appropriation to establish the terminus of the interceptor drain pending the creation of environmental standards agreed upon by both the state and federal governments.  No such standards have been established, and the prohibition has been reenacted nearly every year.

Though prohibited from fixing the drain's endpoint, Interior completed construction on the middle portion of the drain in 1975.  It also created the Kesterson Reservoir as an interim measure to receive the drain's output.

In 1983, studies at Kesterson revealed elevated levels of selenium in the drainage water.  In 1986, Interior closed the reservoir and plugged the drains leading to it.  It continued, however, to provide irrigation water to lands within the Unit.

**B.  Initial District Court Proceedings**

The closing of the Kesterson Reservoir precipitated lawsuits by those adversely affected by the lack of drainage. In *Firebaugh Canal Water District v. United States*, No. 88-CV-634 (E.D. Cal.), Firebaugh alleged that Interior was statutorily obligated to drain lands irrigated by the Unit. Westlands Water District, the Unit's largest water district, along with several individual landowners within the Unit, made a similar allegation in *Sumner Peck Ranch v. Bureau of Reclamation*, No. 91-CV-48 (E.D. Cal.).

The district court partially consolidated the two actions to address the common allegation.  On plaintiffs' motion for partial summary judgment, the district court held that section 1(a) of the San Luis Act required Interior to drain lands within the Unit.  It then rejected Interior's argument that Congress's ban on fixing the drain's endpoint and other changed circumstances had implicitly repealed or excused the obligation.  Based on those rulings, the district court entered a partial judgment requiring Interior to "take such reasonable and necessary actions to promptly prepare, file and pursue an application for a discharge permit" for completion of the interceptor drain.  Interior appealed.

**C.  *Firebaugh I***

In *Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) ("*Firebaugh I*"), we upheld the district court's ruling that "the San Luis Act mandated the Secretary to provide the interceptor drain." *Id.* at 574.  We further held that "subsequent Congressional action has not eliminated the Department's duty to provide drainage, but that it has given the Department the authority to pursue alternative options

other than the interceptor drain to satisfy its duty under the San Luis Act." *Id.* at 577.  Accordingly, we reversed the portion of the judgment requiring Interior to seek a permit for the interceptor drain, and remanded for further proceedings. *See id.* at 578.

## D.  Interior's Actions After *Firebaugh I*

On remand, the district court modified its judgment to require Interior to "without delay, provide drainage to the San Luis Unit pursuant to the statutory duty imposed by section 1(a) of the San Luis Act."  Consistent with our holding that Interior retained broad discretion to choose a drainage solution, the district court's only specific directive was that Interior submit "a detailed plan describing the action or actions, whether short term or long term, [it] will take to promptly provide drainage to the San Luis Unit, which plan shall contain a schedule of dates by which the action or actions described in the plan will be accomplished."

Interior submitted an action plan on April 18, 2001.  The plan identified ten "milestones" and proposed dates for their completion, which dates have been amended several times.

Pursuant to the action plan, Interior conducted an extensive re-evaluation of the Unit's drainage situation, including public comment and examination of environmental impact issues.  A report completed in December 2002 estimated that 379,000 acres would require drainage by 2050; that total included 24,000 located outside the Unit, in Firebaugh's service area.

In March 2007, Interior issued a record of decision announcing that it had selected an "in-valley" drainage

alternative. Through that alternative, Interior undertook to (1) reduce the amount of drainwater through treatment and reuse, and (2) dispose of the remaining wastewater in evaporation ponds and, later, landfills. The alternative also called for retirement of some lands from irrigated farming, a measure proposed by local water districts.

Interior estimated that its "in-valley" alternative would eventually cost $2.69 billion. It is, however, constrained by existing legislation to spend no more than $429 million on construction costs. In addition, Interior determined that the water districts that would benefit from the drainage plan lacked the current ability to pay the difference, as required by current reclamation law. Therefore, Interior submitted a feasibility study to Congress that outlined changes in legislation that would be required to fully implement the plan. Congress has taken no action to increase the cap on construction costs, or to defer or excuse the Unit's water districts' obligation to repay them.

Notwithstanding the lack of congressional action, Interior undertook drainage projects that fell within its existing construction cap. In 2009, it submitted to the district court a control schedule setting forth its proposals for such actions through 2019. The district court adopted the control schedule, and Interior submitted periodic status reports addressing its compliance with the schedule.

As of the end of fiscal year 2011, Interior had secured $7 million in appropriations for control schedule projects, and had spent $5.5 million of those appropriations on pre-construction activities for a demonstration treatment plant in one of the Unit's water districts, as well as a self-sufficient

drainage system for a portion of another district. It also requested more than $14 million for fiscal year 2012.

## E.  Subsequent District Court Proceedings

Interior settled with the in-Unit landowners in 2002, leaving Firebaugh as the only plaintiff. Firebaugh filed a fourth—and later, fifth—amended complaint setting forth claims against Interior. Although the complaint also referred to claims against four in-Unit water districts—Westlands Water District, Panoche Water District, Broadview Water District and San Luis Water District—Firebaugh represents that those parties were named as interested parties only, and that "[n]o question of their duty under federal law or state law was ever before the District Court." We accept Firebaugh's representation that its lawsuit did not seek to impose any liability on the in-Unit districts and confine our discussion accordingly.

Firebaugh asserted several claims against Interior, but only two are at issue on appeal. First, Firebaugh alleged that Interior's failure to provide drainage constituted a trespass and nuisance, and sought damages under the Federal Tort Claims Act ("FTCA"). The district court dismissed the FTCA claim in 2004, holding (1) that water suppliers do not, under California law, have a duty to prevent water from draining onto downslope lands, and (2) that Interior's actions fell within the discretionary function exception to FTCA liability.

Second, Firebaugh alleged that Interior's failure to provide drainage  constituted a final agency action that was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law." In the alternative, it alleged that

Interior's failure to provide drainage constituted agency action unlawfully withheld or unreasonably delayed. Invoking the Administrative Procedure Act ("APA"), it sought an order requiring Interior to "immediately implement[] plans to stop migration of groundwater . . . from the San Luis Unit . . . across the Firebaugh boundary." On cross-motions for summary judgment, the district court held that Interior's "only discrete duty required by law" was to provide drainage within the Unit, and that its actions—though "frustratingly slow"—did "not at present constitute unreasonable delay as a matter of law." Firebaugh timely appealed.

## II

The APA empowers a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).[1]  Four years after *Firebaugh I*, the Supreme Court laid out the parameters of § 706(1) review in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"). Writing for a unanimous Court, Justice Scalia held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. The limitation to "discrete" agency action, the Court concluded, precludes a "broad programmatic attack," *id.*,

---

[1] Firebaugh also bases its APA claim on 5 U.S.C. § 706(2)(A), which authorizes a court to "set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." However, because Firebaugh challenges Interior's *failure* to provide drainage, there is no agency action for us to "set aside." *See Hells Canyon Preservation Council v. United States Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) ("To bring a claim under 5 U.S.C. § 706(2), plaintiffs must identify a final agency action upon which the claim is based.").

while "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law," *id.* at 65:

> Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be.

*Id.*

Thus, under *SUWA*, Firebaugh must show that Interior has failed to take a discrete action that it is legally required to take. Firebaugh proffers two such actions: (1) a duty to provide drainage to lands *outside* the Unit, and (2) a duty to provide drainage *within* the Unit. It argues that both duties are imposed by the San Luis Act.

## A. Drainage Outside The Unit

Section 5 of the San Luis Act presents a serious—and, in our view, insurmountable—obstacle to Firebaugh's claim that the Act requires Interior to provide drainage to lands outside the Unit. That section addresses drainage facilities "designed to serve the general area of which the lands to be served by the San Luis unit are a part." But unlike section 1(a)—which states that the features of the Unit "shall" include "necessary . . . drains"—section 5 merely "authorize[s]" Interior to build and operate drainage facilities.

In *Firebaugh I*, we ascribed different meanings to Interior's "authority" to construct the San Luis Unit and the

mandatory language to include "necessary . . . drains" if the Unit was to be constructed:

> Thus, although the Department of the Interior was only authorized (and not required) to construct the *unit*, once it decided to construct the unit, it was *required* to construct "necessary . . . drains" as part of the unit. In other words, the Department's discretion was limited to the decision whether to build the unit, not to pick and choose which "principal engineering features" to include in the unit—Congress made that decision.

203 F.3d at 574 (omission in original).

Firebaugh notes that section 1(a) refers to the drainage requirements of the Unit as those "generally outlined in the report of Department of the Interior, entitled 'San Luis Unit, Central Valley Project,' dated December 17, 1956." The 1956 report generally discussed drainage within the Unit, estimating, for example, that "[a]pproximately 96,000 acres along the lower fringes of the service area will require a drainage system for the disposal of saline water unsuitable for reuse." The closest it comes to mentioning out-of-Unit drainage is a reference that possible problems in the lower part of the service area might also crop up "in a few isolated spots elsewhere." Even then, however, the proposed solution was a system of tile drains "along the eastern edge of the [service] area." At best, the report anticipated that in-Unit drainage issues could affect downslope lands; it made no proposal for solving those issues by providing drainage to downslope lands.

Firebaugh argues that Congress could not have foreseen the effects of Interior's failure to construct the interceptor drain as planned. But the inclusion of section 5 demonstrates Congress's awareness that operation of the Unit would impact lands outside the Unit because Interior's discretion to provide drainage facilities to out-of-Unit lands was expressly limited "to the extent the works authorized in section 1 of this Act contribute to drainage requirements of said area."

Construing section 1(a) to require drains outside the Unit would render section 5 unnecessary. We are bound to respect Congress's decision to address the possible impact of in-Unit irrigation by authorizing, but not requiring, drainage outside the Unit.

## B.  Drainage Within The Unit

As *Firebaugh I* held, Interior is obligated to provide drainage to lands inside the Unit. At oral argument, Interior acknowledged that it is bound by that holding and by the district court's judgment requiring it to provide a drainage solution "without delay." We therefore have no occasion to address whether *SUWA* would command a different result today.

We can say, however, that the duty announced in *Firebaugh I* is the only thing on which Firebaugh can base its claim. There are simply no other, more specific acts for the district court to compel as "unlawfully withheld" or "unreasonably delayed" under § 706(1).

We agree with the district court that Interior is neither withholding nor unreasonably delaying drainage within the Unit. Its "in-valley" solution has been in place since 2007.

And while Firebaugh's frustration with the pace of implementation is quite understandable, that pace is determined by the scope and cost of the project.  Those obstacles are not, by and large, a product of Interior's inaction.  For example, Interior can seek appropriations for drainage projects—and, indeed, has done so—but it is ultimately up to Congress to provide funds.  Likewise, it is for Congress to decide whether to lift the current cap on construction costs or to excuse in-Unit districts from their obligation to eventually repay those costs.

Firebaugh proposes that Interior take certain steps to counter congressional inertia, such as categorizing construction costs as "maintenance and operation," for which there is no appropriations cap.  Whatever their merits, Firebaugh's proposals do not involve discrete actions that Interior is legally required to take; rather, they involve matters of discretion and, as such, are beyond the scope of § 706(1).

## III

The FTCA makes the United States liable for tort damages "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  Excepted from this waiver of sovereign immunity are claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  *Id.* § 2680(a).  The district court held that Firebaugh's FTCA claim was barred under both the "private analog" requirement of § 2674 and the "discretionary function" exception of § 2680(a).

## A. Private Analog

The question of whether a private analog exists is a question of "whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred." *Rayonier, Inc. v. United States*, 352 U.S. 315, 319 (1957).  In *United States v. Olson*, 546 U.S. 43 (2005), the Supreme Court reaffirmed that the proper analogy is to "state-law liability of private entities, not to that of public entities." *Id.* at 46 (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955)).

As far as we are aware, no California case addresses the tort liability of *private* water suppliers for the downslope effects of the water they provide.  Firebaugh argues that the San Luis Act imposes such liability, but violations of federal law "are not actionable under the FTCA because any liability would arise under federal rather than state law." *Jachetta v. United States*, 653 F.3d 898, 904 (9th Cir. 2011). Conversely, case law holding that public water districts are not "responsible for the acts of its users when the District does no more than supply water," *Hagemann v. West Stanislaus Irrigation Dist.*, 144 Cal. App. 3d 910, 914 (Ct. App. 1983), are inapposite under *Olson*.  *See Tekle v. United States*, 511 F.3d 839, 851 (9th Cir. 2007) ("The Court [in *Olson*] emphasized the 'private person' language, rejecting the notion that the United States would be liable only if a state or municipal entity would be liable.").

The absence of cases exactly on point is not necessarily fatal to Firebaugh if there is an appropriate analogy.  *See Olson*, 546 U.S. at 46 ("[T]he words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield.").  Rather than undertake a

search for one, we assume the existence of a private analog and proceed to the discretionary function inquiry.

## B.  Discretionary Function Exception

Determining whether the discretionary function exception applies is a two-step inquiry.  *See Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (citing *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).  "First, we must determine whether the challenged actions involve an element of judgment or choice."  *Id.* (internal quotation marks omitted).  "When a specific course of action is not prescribed," "[w]e then must consider whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy."  *Id.* (internal quotation marks omitted).

In its reply brief, Firebaugh argues that the duty embodied in section 1(a) of the San Luis Act removes any element of discretion and, therefore, makes the discretionary function exception inapplicable.  That argument, however, ignores *Firebaugh I*'s explicit caveat that Interior retains "broad discretion" as to how drainage is to be provided.  203 F.3d at 577.

Interior's actions in developing a drainage solution for the Unit clearly implicate considerations of policy, including environmental policy (in closing the Kesterson Reservoir), economic policy (in continuing to provide irrigation to communities in which agriculture is the predominant industry), and—perhaps most importantly—the fiscal limitations imposed by Congress.  For these reasons, we conclude that providing irrigation water without

concomitantly providing adequate drainage for it is a discretionary function and, therefore, not actionable under the FTCA.

## IV

We do not minimize the very real costs that continued operation of the San Luis Unit imposes on downslope lands, and we repeat *Firebaugh I*'s holding that Interior is obliged to find a solution.  We also reaffirm, however, that the contours of the solution lie within Interior's discretion.  That discretion places Interior's actions beyond the scope of both the APA and the FTCA.

There is, to be sure, some point at which Interior's actions could become so sluggish that we could rightly say that the agency has entirely abandoned its legal duty to provide drainage within the San Luis Unit.  The record before us does not now support that conclusion.  Accordingly, the judgment of the district court is

**AFFIRMED.**