**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; CALIFORNIA SPORTFISHING PROTECTION ALLIANCE; FRIENDS OF THE RIVER; SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC.; THE INSTITUTE FOR FISHERIES RESOURCES; FELIX SMITH, *Plaintiffs-Appellants*, | No. 17-17130<br><br>D.C. No. 2:11-cv-02980-KJM-CKD |
| v. | |
| DONALD R. GLASER, Regional Director of the U.S. Bureau of Reclamation; UNITED STATES BUREAU OF RECLAMATION; SAN LUIS & DELTA MENDOTA WATER AUTHORITY, *Defendants-Appellees.* | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted June 10, 2019
San Francisco, California

Filed September 6, 2019
Amended December 20, 2019

Before:  MARY M. SCHROEDER and MILAN D.
SMITH, JR., Circuit Judges, and DOUGLAS L. RAYES,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

## SUMMARY[**]

---

### Clean Water Act

The panel filed an amended opinion reversing the district court's judgment in an action alleging that the drainage system managed by the U.S. Bureau of Reclamation and the San Luis & Delta Mendota Water Authority discharged pollutants into surrounding waters in violation of the Clean Water Act, 33 U.S.C. §§ 1251-1387; and denied petitions for panel rehearing.

The Central Valley Project is a federal water management project. The Grasslands Bypass Project, jointly administered by the defendants, is a tile drainage system that consists of a network of perforated drain laterals underlying farmlands in California's Central Valley that catch irrigated water and direct it to surrounding waters.

The Clean Water Act generally requires that government agencies obtain a National Pollutant Discharge Elimination

---

[*] The Honorable Douglas L. Rayes, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

System permit before discharging pollutants from any point source into navigable waters of the United States. There is an exception to that permitting requirement "for discharges composed entirely of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1).

The panel held that the district court properly interpreted "discharges . . . from irrigated agriculture," as used in § 1342(l)(1), to mean discharges from activities related to crop production. The panel held that the district court ought to have begun its analysis with the statutory text, but its reliance on legislative history to construe this portion of the statute was not erroneous. The panel further held, however, that the district court erred by interpreting "entirely" to mean "majority," and by placing the burden on plaintiffs to demonstrate that the discharges were not covered under § 1342(l)(1), rather than placing the burden on defendants to demonstrate that the discharges were covered under § 1342(l)(1). The panel concluded that the district court's erroneous interpretation of the word "entirety" was the but-for-cause dismissal of plaintiffs' Vega claim (concerning groundwater discharges from lands underlying a solar project), and the panel, therefore reversed the district court's dismissal of that claim. The panel further concluded that the district court's dismissal of plaintiffs' other claims was also erroneous, reversed the dismissal of those claims, and remanded for the district court to reconsider them under the correct interpretation of § 1342(l)(1).

The panel held that the district court erred by striking plaintiffs' seepage and sediment theories of liability from plaintiffs' motion for summary judgment because the first amended complaint encompassed those claims.

## COUNSEL

Stephan C. Volker (argued), Alexis E. Krieg, Stephanie L. Clarke, and Jamey M.B. Volker, Law Offices of Stephan C. Volker, Berkeley, California, for Plaintiffs-Appellants.

Brian C. Toth (argued) and Martin F. McDermott, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Amy L. Aufdemberge, Office of the Solicitor, Department of the Interior, Washington, D.C., for Defendants-Appellees Donald R. Glaser and United States Bureau of Reclamation. Eric J. Buescher (argued), and Joseph W. Cotchett, Cotchett Pitre & McCarthy LLP, Burlingame, California; Diane V. Rathmann, Linneman Law LLP, Dos Palos, California; for Defendant-Appellee San Luis & Delta Mendota Water Authority.

Ellen L. Wehr, Grassland Water District, Los Banos, California, for Amicus Curiae Grassland Water District.

## ORDER

The opinion filed on September 6, 2019, and reported at 937 F.3d 1191 is hereby amended as follows:

At 937 F.3d at 1196, <underlying a solar product> is replaced with <underlying a solar project>.

At 937 F.3d at 1200, <which both parties now concede was erroneous> is replaced with <which Defendants now concede was erroneous>.   <Accordingly, the lack of

evidence demonstrating that the discharges stemmed from activities unrelated to crop production should not have been fatal to Plaintiffs.> is replaced with <Accordingly, even if there were a lack of evidence demonstrating that the discharges stemmed from activities unrelated to crop production, it should not have been fatal to Plaintiffs.>. Additionally, <But if a "the complaint . . .> is replaced with <But if "the complaint . . .>.

A clean copy of the amended opinion is attached to this order.

With the foregoing amendments, the pending petitions for panel rehearing are DENIED. Dkt. Nos. 57, 62. The Grassland Water District's motion to file an amicus curiae brief is GRANTED. Dkt. 59. No further petitions for panel rehearing or rehearing en banc will be entertained.

---

**OPINION**

M. SMITH, Circuit Judge:

California's Central Valley features some of the most fertile agricultural land in the United States, but it typically receives less rainfall than necessary to cultivate the crops grown in the Valley. To help address this problem, the federal government has constructed and managed several irrigation and drainage projects.

Plaintiffs, a group of commercial fishermen, recreationists, biologists, and conservation organizations, sued Defendants Donald Glaser, the United States Bureau of Reclamation, and the San Luis & Delta Mendota Water Authority, alleging that the drainage system managed by Defendants discharges pollutants into surrounding waters, in

violation of the Clean Water Act (CWA), 33 U.S.C. §§ 1251–1387. Plaintiffs appeal several rulings by the district court in favor of Defendants that ultimately led to the stipulated dismissal of Plaintiffs' single claim remaining for trial. We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

As "the largest federal water management project in the United States," the Central Valley Project (CVP) "provides the water that is essential to [the California Central Valley's] unparalleled productivity." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir. 2002). Among other functions, the CVP "transfer[s] water from the Sacramento River to water-deficient areas in the San Joaquin Valley and from the San Joaquin River to the southern regions of the Central Valley." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 594 (9th Cir. 2014).

"Any water project that brings fresh water to an agricultural area must take the salty water remaining after the crops have been irrigated away from the service area." *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 571 (9th Cir. 2000). Otherwise, irrigating the selenium and salt-rich soils causes pollutants to leach into groundwater. The Grasslands Bypass Project (the Project), jointly administered by Defendants, was created for this purpose. The Project is "a tile drainage system that consists of a network of perforated drain laterals underlying farmlands in California's Central Valley that catch irrigated water and direct it to" surrounding waters. The map below depicts the Project's location:



The Project includes the San Luis Drain (the Drain), labeled on the map above, which is designed to collect and convey contaminated groundwater from lands adjacent to and upstream of the Drain to Mud Slough. As both parties

acknowledge, the Drain discharges substantial quantities of selenium and other pollutants into the Mud Slough, the San Joaquin River, and the Bay-Delta Estuary.

## B.  Procedural Background

Plaintiffs filed their initial complaint in November 2011, alleging that Defendants violated the CWA by discharging pollutants into the waters of the United States without a National Pollutant Discharge Elimination System (NPDES) permit, in violation of 33 U.S.C. § 1311(a).  After the district court granted Defendants' motion to dismiss with leave to amend, Plaintiffs filed their First Amended Complaint (FAC).

Defendants then moved to dismiss the FAC.  The court granted the motion as to all but one of Plaintiffs' claims.  It determined that Plaintiffs had plausibly alleged facts "that, when accepted as true, suggest [that] at least some amount of the Project's discharges may be unrelated to crop production."

The parties then filed cross-motions for summary judgment.  The court denied Plaintiffs' motion for summary judgment and granted in part Defendants' motion for summary judgment.  The court held that three of Plaintiffs' theories of liability in their motion for summary judgment— arguments about discharges from "seepage into the [Drain] from adjacent lands, and sediments from within the [Drain]"—did not arise from the allegations in their FAC. Accordingly, the court struck those three theories of liability. The court also determined, however, that there was a genuine dispute of material fact as to whether groundwater discharges from lands underlying a solar project violated the CWA (the Vega Claim).  It therefore denied Defendants' motion for summary judgment as to that claim.

Plaintiffs moved to file a second amended complaint. The court denied that motion. The court also denied Plaintiffs' motion to reconsider its order ruling on the cross-motions for summary judgment. The parties then stipulated to the dismissal of Plaintiffs' lone remaining claim "because the discharges from the Vega Solar Project property do not make up a majority of discharges from the [Project]." The district court entered judgment for Defendants.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* the district court's grant of summary judgment. *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1203 (9th Cir. 2013). We also review *de novo* "the district court's interpretation of the CWA and its implementing regulations." *Olympic Forrest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018).

## ANALYSIS

### I.  The District Court's Interpretation of § 1342(l)(1)

The CWA generally requires that government agencies obtain an NPDES permit before discharging pollutants from any point source into navigable waters of the United States.[1] 33 U.S.C. § 1323(a). There is an exception to that permitting requirement, however, "for discharges composed entirely of

---

[1] The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

return flows from irrigated agriculture . . . ."    *Id.*
§ 1342(l)(1).

The parties do not disagree that the Mud Slough, the San
Joaquin River, and the Bay-Delta Estuary constitute
navigable waters of the United States.  They also do not
dispute that the Drain "discharges substantial quantities of
selenium and other pollutants."  At issue then is whether the
Drain's discharges required Defendants to obtain an NPDES
permit, or whether the discharges were exempt from the
permitting requirement pursuant to § 1342(l)(1).

Plaintiffs argue that the district court committed three
errors in its interpretation of § 1342(l)(1).   First, they
contend that the district court erred by placing the burden of
proving that the Drain's discharges were not exempt on
Plaintiffs instead of requiring that Defendants prove that the
Drain's discharges were exempt.  Second, they argue that the
court erred in interpreting what constitutes "discharges . . .
from irrigated agriculture" when it held that all discharges
from the Drain are exempted so long as they are not
generated by activities unrelated to crop production.  Third,
they assert that the district court erred by interpreting the
word "entirely" as meaning most.   We address each
argument in turn.

## A.  Burden of Proving the Statutory Exception

In its pretrial order, the district court stated that Plaintiffs
bore the burden of demonstrating that the discharges at issue
were not exempt from the CWA's permitting requirement
pursuant to § 1342(l)(1).   Plaintiffs argue that such an
interpretation of the statute was erroneous because the
burden was on Defendants to prove that the discharges at
issue were covered by § 1342(l)(1).

We agree.  To establish a violation of the CWA, "a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source."  *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993).  After a plaintiff establishes those elements, however, the defendant carries the burden to demonstrate the applicability of a statutory exception to the CWA.  *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007).  Because § 1342(l)(1) contains an exception to the CWA's permitting requirement, Defendants had the burden of establishing that the Project's discharges were "composed entirely of return flows from irrigated agriculture."

## B.  Interpretation of "Irrigated Agriculture"

The district court construed § 1342(l)(1) as exempting discharges that are related to crop production from the CWA's permitting requirement.  The parties agree that, by focusing on the statute's legislative history *ab initio*, rather than commencing its analysis with the text, the district court's interpretive method was flawed.

> "It is well settled that 'the starting point for interpreting a statute is the language of the statute itself.'"  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)).  Section 1342(l)(1) states that "[t]he Administrator shall not require a permit under this section for discharges . . . from irrigated agriculture."   33 U.S.C. § 1342(l)(1).  Here, rather than starting its analysis with the text, the district court focused first on the Senate Committee Report

accompanying the CWA to hold that the relevant statutory text—"discharges . . . from irrigated agriculture"—meant discharges that "do not contain additional discharges from activities unrelated to crop production."

Although we agree that the district court ought to have begun its analysis with the statutory text, its reliance on legislative history to construe this portion of the statute was not erroneous. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't. of Treasury*, 489 U.S. 803, 809 (1989). "The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute." *Robinson v. United States*, 586 F.3d 683, 686 (9th Cir. 2009) (quoting *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999)).

Section 1342(l)(1) does not define "irrigated agriculture." In determining the plain meaning of a word, we may consult dictionary definitions in an attempt to capture the common contemporary understandings of a word. *See Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010). The definition of agriculture—"the science or art of cultivating the soil, harvesting crops, and raising livestock," *Webster's Third New International Dictionary* 44 (2002)—shows that the term has a broad meaning that encompasses crop production. The "ordinary, contemporary, and common meaning" of agriculture likewise supports a broad interpretation of the term. *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir. 1998).

Although the plain meaning of the statutory text demonstrates that agriculture has a broad meaning, it does not resolve whether the discharges at issue here are exempt from the CWA's permitting requirement.**[2]** As a result, "we may [also] use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent" in enacting § 1342(l)(1). *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009) (quoting *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006)).

In this instance, we begin by considering the legislative history of § 1342(l)(1). In its original form, the CWA did not contain any exceptions to its permitting requirement. *See Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1072 (9th Cir. 2011), *rev'd and remanded sub nom. Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013). Five years after its enactment, however, Congress amended the CWA to include an exception for discharges composed entirely of return flows from irrigated agriculture. *Id.* at 1073. "Congress did so to alleviate EPA's burden in having to issue permits for every agricultural point source." *Id.* By passing § 1342(l)(1), Congress sought "to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production." S. Rep. No. 95-370, 35 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4326, 4360. This history supports the district court's interpretation of "irrigated agriculture" as used in § 1342(l)(1).

The statute's legislative history also reveals that Congress passed § 1342(l)(1) to treat equally under the

---

**[2]** One issue disputed by the parties, for example, is whether discharges from fallow and retired lands fall under § 1342(l)(1). The plain meaning of the statutory text does not definitively answer that question.

CWA's permitting requirement farmers relying on irrigation and those relying on rainfall. *See* 123 Cong. Rec. 39,210 (Dec. 15, 1977) (statement of Sen. Wallop: "This amendment corrects what has been a discrimination against irrigated agriculture. . . . Farmers in areas of the country which were blessed with adequate rainfall were not subject to permit requirements on their rainwater run-off, which in effect . . . contained the same pollutants."); 123 Cong. Rec. 26,702 (Aug. 4, 1977) (statement of Sen. Stafford: "This amendment promotes equity of treatment among farmers who depend on rainfall to irrigate their crops and those who depend on surface irrigation which is returned to a stream in discreet conveyances."). Indeed, one legislator said that an NPDES permit would not be required for "a vast irrigation basin that collects all of the waste resident of irrigation water in the Central Valley and places it in [the San Luis Drain] and transport[s] it . . . [to] the San Joaquin River." *Brown*, 640 F.3d at 1072. This history supports the view that Congress intended for "irrigated agriculture," as used in § 1342(l)(1), to be defined broadly and include discharges from all activities related to crop production.

Plaintiffs argue that such an interpretation of the statutory exception is erroneous because it would exempt fallow and retired lands from the CWA's permitting requirement. That result, however, complies with our prior case law addressing the Project. We have ordered Defendants, in separate litigation, to provide drainage "to lands receiving water through the San Luis Unit." *Firebaugh Canal Co.*, 203 F.3d at 572. The retirement of farmlands was a component of that drainage plan. *Firebaugh Canal Water Dist. v. United States*, 712 F.3d 1296, 1300 (9th Cir. 2013). To hold that drainage from retired lands does not fall under the CWA's statutory exception for discharges from irrigated agriculture would

lead to contradictory and illogical results. *Cf. United States v. Fiorillo*, 186 F.3d 1136, 1153 (9th Cir. 1999). We decline to require Defendants to provide a drainage plan that includes the retirement of farmland, on the one hand, and hold that those activities violate the CWA absent a permit, on the other.

For these reasons, § 1342(l)(1)'s statutory text, as well as its context, its legislative history, and our prior case law on the Project, demonstrate that Congress intended to define the term "irrigated agriculture" broadly. Accordingly, we hold that the district court's interpretation of the phrase was accurate.

## C. Interpretation of "Entirely"

We next address Plaintiffs' contention—which Defendants do not dispute—that the district court erred by holding that § 1342(l)(1) exempts discharges from the CWA's permitting requirement unless a "majority of the total commingled discharge" is unrelated to crop production. They argue that such an interpretation of the statutory text was mistaken because the text states that the exception applies to "discharges composed *entirely* of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1).

We agree that the district court's majority rule interpretation misconstrued the meaning of "entirely," as used in § 1342(l)(1). Although "entirely" is not defined by the statute, we begin by considering its "ordinary, contemporary, common meaning." *Iverson*, 162 F.3d at 1022. "Entirely" is defined as "wholly, completely, fully." *Webster's Third New International Dictionary* 758 (2002). That definition differs significantly from "majority," the meaning that the district court gave the term.

The district court rejected a literal interpretation of "entirely" because it reasoned that it "would lead to an absurd result." We disagree. "Claims of exemption, from the jurisdiction or permitting requirements, of the CWA's broad pollution prevention mandate must be narrowly construed to achieve the purposes of the CWA." *N. Cal. River Watch*, 496 F.3d at 1001. Given the many activities related to crop production that fall under the definition of "irrigated agriculture," Congress's use of "entirely" to limit the scope of the statutory exception thus makes perfect sense. The text demonstrates that Congress intended for discharges that include return flows from activities unrelated to crop production to be excluded from the statutory exception, thus requiring an NPDES permit for such discharges.

## D.  Effect of Errors on Plaintiffs' Claims

Having determined that the district court erred by placing the burden of demonstrating eligibility for the exception on Plaintiffs, rather than on Defendants, and by misinterpreting "entirely," as used in § 1342(l)(1), we next consider the effect of those errors on Plaintiffs' claims. Defendants argue that the district court's errors were harmless because "the record contains no evidence of *any* discharge of pollutants unrelated to agricultural flows."

We begin with Plaintiffs' Vega Claim. The district court denied Defendants' motion for summary judgment as to that claim because it determined that "Plaintiffs [] have provided sufficient evidence to raise an inference that discharges underneath the Vega Project originate from the solar project itself, as opposed to [from] other nearby agricultural lands." Plaintiffs stipulated to the dismissal of that claim because they were "unlikely to succeed [in demonstrating that] the discharges from the [Vega Claim] do not make up a majority

of discharges from the [Project]." The district court's interpretation of the word "entirely" to mean "majority"—which Defendants now concede was erroneous—was thus the but-for cause of the dismissal of Plaintiffs' Vega Claim. It is reasonable to believe that Plaintiffs would have proceeded to trial under the correct interpretation of § 1342(l)(1), which requires Defendants to prove that the discharges were composed entirely of return flows from irrigated agriculture. We therefore reverse the district court's dismissal of that claim.

The district court's dismissal of Plaintiffs' other claims was also erroneous. In its order ruling on the parties' cross-motions for summary judgment, the district court determined that, apart from the Vega Claim, Plaintiffs had failed to "provide any evidence" to show that discharges stemmed from activities unrelated to crop production. Because the burden of demonstrating the applicability of § 1342(l)(1) should have been on Defendants, rather than on Plaintiffs, however, Plaintiffs were not required to present any evidence. Instead, Defendants ought to have been required to demonstrate that the discharges at issue were composed entirely of return flows from irrigated agriculture. Accordingly, even if there were a lack of evidence demonstrating that the discharges stemmed from activities unrelated to crop production, it should not have been fatal to Plaintiffs. *Cf. Gilbrook v. City of Westminster*, 177 F.3d 839, 871 (9th Cir. 1999) ("Such an inference from lack of evidence would amount to no more than speculation."). We therefore reverse the district court's dismissal of Plaintiffs' other claims and remand for the district court to reconsider them under the correct interpretation of § 1342(l)(1).

## II. The District Court's Striking of Plaintiffs' Claims

Plaintiffs argue that the district court also erred by striking their theories of liability "based on discharges from highways, residences, seepage into the [Drain] from adjacent lands, and sediments from within the [Drain]" from Plaintiffs' motion for summary judgment. The court held that those claims were not encompassed by Plaintiffs' FAC.

"Rule 8's liberal notice pleading standard . . . requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)). "A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case." *Am. Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781, 786 (9th Cir. 1982). But if "the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).

Here, Plaintiffs' FAC alleged that the Drain discharged "polluted groundwater . . . originating from parcels where no farming occurs because, for instance, these parcels have been fallowed or retired from agricultural use." The theories of liability struck by the district court argued that Defendants violated the CWA because the Drain picked up seepage from non-irrigated land on its way to the Mud Slough, and because the Drain discharged pollutants from seepage and sediment within the Drain.

Although we agree with Defendants that Plaintiffs' complaint did not specifically allege their seepage and sediment theories of liability, we reject the contention that Defendants had not been given fair notice of those theories. Plaintiffs' essential allegation was that the Drain's discharges violated the CWA because of where the contaminants in the discharges originated from—"for instance, [] parcels [that] have been fallowed or retired from agricultural use." Plaintiffs' seepage and sediment claims, which alleged that contaminants from "highways, residences, seepage . . . and sediment" commingled with other discharges and thereby violated the CWA, alleged that contaminants originated from other locations, too. Those allegations were thus encompassed by the allegations in the FAC. Indeed, at oral argument, Defendants conceded that they "received [Plaintiffs'] expert witness reports," "were on notice as to what their expert was talking about," and "had enough information to respond" to the seepage and sediment theories of liability discussed in Plaintiffs' expert witness reports. These facts, when taken together, compel the conclusion that Plaintiffs' FAC provided Defendants with fair notice of their seepage and sediment theories of liability. Accordingly, we reverse the district court's striking of Plaintiffs' seepage and sediment claims from their motion for summary judgment.[3]

---

[3] The district court held, in the alternative, that Plaintiffs' seepage and sediment claims were "unsupported by evidence." Because we hold that the district court erred in its interpretation of § 1342(l)(1), however, we remand Plaintiffs' seepage and sediment claims for the district court to determine whether they survive summary judgment under the correct interpretation of the statutory exemption.

## CONCLUSION

The district court properly interpreted "discharges . . . from irrigated agriculture," as used in § 1342(l)(1), to mean discharges from activities related to crop production. It erred, however, by interpreting "entirely" to mean "majority," and by placing the burden on Plaintiffs to demonstrate that the discharges were not covered under § 1342(l)(1), rather than placing the burden on Defendants to demonstrate that the discharges were covered under § 1342(l)(1). The district court also erred by striking Plaintiffs' seepage and sediment theories of liability from Plaintiffs' motion for summary judgment because the FAC encompassed those claims.

**REVERSED and REMANDED.**